Affirmed and Memorandum Opinion filed October 30, 2007








Affirmed and Memorandum Opinion filed October 30, 2007.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-06-00729-CR

NO. 14-06-00730-CR

____________

 

NAVID OCHEGHAZ GHAHREMANI, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 179th
District Court

Harris County, Texas

Trial Court Cause Nos. 1030953
and 1030954

 



 

M EM O R A N D U M  O P I N I O N

Appellant Navid Ocheghaz Ghahremani appeals his convictions
for sexual assault of a child and aggravated sexual assault of a child.  He
asserts the trial court erred in (1) denying his request for a hearing on his
motion for new trial, (2) in denying his request for a voir dire examination of
a witness, and (3) in allowing the State=s expert testimony
during the punishment phase.  Appellant also claims the State committed
prosecutorial misconduct during the punishment phase.  We affirm. 








I.  Factual and Procedural
Background

Appellant met L.S., a thirteen-year old girl, on the
internet.  In the course of their conversation, L.S. stated that she was a
fifteen-year-old girl.  Appellant told L.S. that he was  twenty years old. 
During their internet encounters, appellant and L.S. discussed sexual
intercourse and made plans to meet in person.  Many of L.S.=s friends knew
about her online Arelationship@ with appellant.  However,
L.S.=s parents believed
L.S. was communicating with a boy who attended her school.

With appellant=s encouragement,
L.S. developed a story to tell her parents so that she could meet appellant in
person.  L.S. told her parents that she and her thirteen-year old girlfriend,
J.R., planned to spend the night at another school friend=s home.   J.R.
told her parents the same story.  The real plan, however, was for appellant to
pick both of the girls up that evening.  Appellant picked the girls up and
drove them to a mall.  After leaving the mall, appellant drove them to a tattoo
parlor, and J.R. went inside.  During this time, L.S. and appellant talked and
kissed.  When they stopped kissing, appellant turned his head and then turned
back to kiss L.S. again.  During this kiss, L.S. felt a pill dissolve in her
mouth.  When L.S. asked appellant what the pill was, he replied AEcstasy.@  Then, appellant
told L.S. to pull her pants down so that he could touch her.  Appellant
penetrated her vagina with his finger. Appellant pulled his pants down, and
L.S. performed oral sex on him.   Appellant and L.S. stopped because J.R. was
waiting for them.








Soon thereafter, appellant and L.S. joined J.R. in the
tattoo parlor.   While the girls got their ears pierced, J.R. noticed that L.S.
was shaky, and appeared Ahigh.@  Afterwards
appellant drove the girls to his apartment.   L.S. asked appellant to take them
to their friend=s house, and appellant refused.  With no
way to get to their friend=s house, the girls spent the night at
appellant=s apartment.  Appellant fixed the girls alcoholic
drinks and offered them Xanax pills.  L.S. fell asleep and awoke to discover
that appellant was having sex with her, which hurt L.S. immensely.  However,
L.S. was unable to stop appellant and passed out.  L.S. awoke one other time to
find that appellant was having sex with her again.  Also during this same
night, J.R. awoke on two occasions to find appellant having sex with her. 

The following morning, L.S. asked appellant if they had
engaged in sexual intercourse, and appellant confirmed that they had. 
Appellant was washing his sheets and explained that he was doing so because
L.S. had thrown up all over them.  Eventually, appellant drove L.S. and J.R to
school to drop them off.  At school, L.S. became nauseous and had severe pain
in her vagina.  She had trouble walking, and her speech was slurred.  J.R. also
had immense pain in her vagina and noticed that she was bleeding.  

L.S. called a friend for a ride home.  After the friend
picked L.S. up from school, L.S. explained to the friend what had happened to
her.  The friend convinced L.S. to tell her parents.   When L.S. arrived at
home, she was still in pain, and it was getting worse.  After L.S. told her
mother what had happened, she went to the bathroom and realized that she was
bleeding.  L.S.=s father called 9-1-1 for medical help and
also summoned the police.  L.S. was taken by ambulance to the hospital. 

Meanwhile, back at the school, J.R. told a teacher what had
happened to her the night before.  The teacher called J.R.=s father to pick
the girl up from school.  When her father arrived, J.R. told him what had
happened.  Her father called the police.  J.R. told the responding officer what
had happened to her and L.S. at appellant=s apartment.








Appellant was charged with the offense of aggravated sexual
assault of a child in cause number 1030953, and sexual assault of a child in
cause number 1030954.  Appellant pleaded Anot guilty@ to both charges. 
A jury found appellant guilty as charged, and assessed punishment at
twenty-eight years= confinement  in cause number 1030953, and
twenty years= confinement in cause number 103954.  Appellant timely
appealed.  On December 28, 2006, appellant filed a motion to abate, claiming
that the trial court had abused its discretion by denying him a hearing on his
motion for new trial.  This court denied appellant=s motion to
abate.  In his appellate brief on the merits, appellant urges this court to
reverse and remand or, alternatively, to abate the appeal. 

II.  Issues Presented

Appellant raises four issues on appeal: 

(1)     The trial court abused its discretion by
denying appellant=s request for a hearing on his
motion for new trial. 

(2)     The trial court erred in denying appellant=s request to conduct a voir dire
examination under Texas Rule of Evidence 705(b) of the state=s expert, Dr. Lawerence Thompson,
during the punishment phase of trial.

(3)     The trial court erred in allowing Dr.
Thompson=s testimony during the punishment
phase of trial in violation of Texas Rule of Evidence 702 and over appellant=s repeated objections, leaving the
jury with the unmistakable impression that sex offenders are incapable of being
cured. 

(4)     The prosecutor=s repeated attempts to inject inadmissible and
highly prejudicial evidence before the jury either by ignoring or circumventing
the trial court=s rulings was prosecutorial
misconduct that entitles appellant to a new punishment hearing. 

 

III. Analysis

A.      Did the
trial court err by denying appellant=s request for a
hearing on his motion for new trial? 

In his first issue, appellant contends that the trial court
erred by denying his request for a hearing on his motion for new trial.  In
that motion, appellant asserted the following grounds: 

(1)     Prosecutorial misconduct during the
examination of the state=s expert witness, Dr. Thompson.

(2)     Fundamental error in the trial court=s punishment charge.

(3)     Ineffective assistance of counsel at the
punishment stage based on trial counsel=s alleged failure to: 








(a)     preserve error during direct examination of
Dr. Thompson,

(b)     interview and present an expert on treatment
of sex offenders, and 

(c)     call
punishment witnesses in support of community supervision.

On appeal, appellant contends this court should abate for a
hearing in the trial court based on the above grounds.[1] 
Appellant=s arguments in his first issue on appeal focus on the
sufficiency of the affidavit attached to his motion.  To be entitled to a
hearing, appellant must raise matters not determinable from the record upon
which he could be entitled to relief.  See Reyes v. State, 849 S.W.2d
812, 816 (Tex. Crim. App. 1993).  In addition, appellant must present an
affidavit showing the truth of the grounds in the motion, and his motion or
affidavit must reflect that reasonable grounds exist for holding that the
relief could be granted.  See id.  For reasons explained below, we
conclude that with respect to each ground for relief asserted, the trial court
did not err in ruling that appellant failed to satisfy these requirements. 
Therefore, it is not necessary to resolve appellant=s arguments as to
the form of his counsel=s affidavit.   

1.       Alleged
Prosecutorial Misconduct








In his first ground for relief, appellant contends that he
is entitled to a hearing on his  motion for new trial based on alleged
prosecutorial misconduct during the State=s examination of
Dr. Thompson during the punishment phase.  Appellant alleges that the
prosecutor committed prosecutorial misconduct because he continued to ask
questions about matters that the trial court correctly had concluded were
inadmissible.  In his motion, appellant specifies eleven such questions. 
Appellant asserts that the record and the State=s line of
questioning show reversible error due to prosecutorial misconduct.  All
identified instances of alleged prosecutorial misconduct are in the record. 
This ground does not raise matters not determinable from the record. 
Accordingly, the trial court did not abuse its discretion in denying appellant
a hearing as to this ground.  See Lindley v. State, 24 S.W.3d 435, 436
(Tex. App.CTexarkana 2000, no pet.) (holding that trial court did
not err in denying hearing on motion for new trial grounds that were
determinable from the record).

2.       Alleged
Fundamental Error in the Punishment Charge

In his second ground for relief, appellant contends that he
is entitled to a new trial because the punishment-phase jury charge was
fundamentally defective in omitting the statutory language that he would not be
entitled to good-conduct time in calculating his parole eligibility.  Appellant
does not direct us to any facts outside the record in connection with this
ground for relief.  The jury charge on punishment is in the record.  Because in
this ground appellant has not raised matters not determinable from the record,
the trial court did not abuse its discretion in denying appellant a hearing as
to this ground.  See Lindley, 24 S.W.3d at 436.

3.       Alleged
Ineffective Assistance of Counsel

In his third ground, appellant asserts that he is entitled
to a new trial because he was denied effective assistance of counsel during the
punishment phase, and appellant specifies three  instances of alleged
ineffective assistance of counsel. 








In his first claim of ineffective assistance of counsel,
appellant contends that his trial counsel was ineffective for failing to
preserve error as to the State=s allegedly improper questioning of the
State=s expert (Dr.
Thompson) during the punishment phase.  In his second claim of ineffective
assistance, appellant contends that his counsel failed to interview and present
a defense expert on the treatment of sex offenders during the punishment
phase.  The record reveals these alleged failures, and appellant did not direct
the trial court to any facts outside the record to support these allegations. 
Appellant asserted his trial counsel=s failures in this
regard showed conduct that was objectively deficient.  Regardless of the merits
of these grounds, they raise matters determinable from the record.  Therefore,
the trial court did not abuse its discretion in denying appellant a hearing as
to these grounds.  See Lindley, 24 S.W.3d at 436; Castoreno v. State,
932 S.W.2d 597, 605 (Tex. App.CSan Antonio 1996, pet. ref=d) (holding trial
court did not err in denying hearing as to new-trial ground that raised matters
determinable from the record). 








In his final claim for ineffective assistance, appellant
contends that his counsel failed to call punishment-phase witnesses who were
available to testify.  Appellant contends that prior to trial, his counsel
interviewed at least six witnesses who were available to testify on his
behalf.  However, neither in his motion nor in its supporting affidavit does
appellant identify these witnesses or state what their testimony would have
been had they testified. Furthermore, as appellant states in his motion for new
trial, both he and his trial counsel stated on the record that the appellant=s failure to call
any witnesses during the punishment phase was (1) a Astrategic decision@ to prevent the
State from presenting rebuttal evidence and (2) based on the defense=s determination
that the record to that point was sufficient.  Appellant states that he should
have the opportunity to prove that this strategic decision Awas the result of
an unreasonably objective investigation.@  Appellant=s counsel=s affidavit filed
in support of the motion for new trial does not develop what the testimony of
these witnesses would have been or state how his trial counsel=s failure to call
these witnesses was not reasonable trial strategy.  Even presuming that
appellant alleged that his trial counsel=s investigation
was Aobjectively
unreasonable,@ the affidavit presented by counsel did not describe
in any way what kind of investigation was undertaken or how it was objectively
unreasonable.  Because appellant=s affidavit did
not show that reasonable grounds existed for holding that the relief could be
granted, the trial court did not abuse its discretion in denying appellant a
hearing as to this ground.  See King v. State, 29 S.W.2d 556, 569 (Tex.
Crim. App. 2000) (holding that trial court did not err in refusing a hearing
when motion for new trial and affidavit failed to explain what investigation
trial counsel should have conducted regarding alibi witness, who appellant=s alleged alibi
witness was, or how an alibi defense could have been persuasive given the
evidence); Jordan v. State, 883 S.W.2d 664, 665 (Tex. Crim. App. 1994)
(concluding that trial court did not abuse its discretion in failing to hold a
hearing on motion for new trial because the affidavit did not state what the
two witnesses who were not subpoenaed would have said, why trial counsel=s investigation
was deficient, or what further investigation would have revealed).[2] 


We conclude that the trial court did not abuse its
discretion in denying appellant a hearing on his motion for new trial. 
Accordingly, we overrule appellant=s first issue.

B.      Did the trial court err in
denying appellant=s request to conduct a voir dire
examination under Texas Rule of Evidence 705(b) of the state=s expert during the punishment
phase of trial?

In appellant=s second issue, he
alleges that the trial court erred in denying his request for a voir dire
examination of the State=s expert, Dr. Lawerence Thompson, outside
the presence of the jury.  Tex. R. Evid.
705 (a)B(b).  Texas Rule
of Evidence 705(b) provides that, before an expert gives an opinion, a party
against whom the opinion is offered, upon request, shall be permitted to
conduct a voir dire examination, which shall be outside the hearing of the jury
and Adirected to the
underlying facts or data upon which the opinion is based.@  Tex. R. Evid.  705 (b).  The purpose of
such a voir dire examination would have been for appellant to explore the facts
and data underlying Dr. Thompson=s opinions.  See
id; Jenkins v. State, 912 S.W.2d 793, 814 (Tex. Crim. App. 1995)
(op. on reh=g).   








The State contends that appellant failed to preserve error
on this issue because appellant=s attorney did not initially specify
whether he was seeking a general voir dire of the witness, or a voir dire under
Rule 705(b).  We disagree.  In this case, before Dr. Thompson gave any expert
opinion during the punishment phase, appellant requested a voir dire
examination under Rule 705(b), and the trial court denied this request.  We
find no merit in the State=s preservation argument.  Any error was
preserved. 

Dr. Thompson=s punishment-phase
testimony occupies less than fourteen pages of the reporter=s record.  After
the trial court denied appellant=s request for a
voir dire examination directed to the underlying facts or data upon which Dr.
Thompson=s opinions are
based, the only questions that Dr. Thompson answered on direct examination were
the following: 

[The State]:            Have you
dealt with predators in that age group that have groomed young girls? 

[Witness]:              I
have. 

. . .

[The State]:            Are you
familiar with studies dealing with whether these people can be cured of this? 

[Witness]:              I am. 

[The State]:            Tell us
what specifically C not the findings, but tell us what
studies that you are familiar with.

. . .     

[Witness]:              Okay. Um, I=m specifically, um, familiar with,
um, literature from the, um, Association for the Treatment of Sexual Abusers,
um, as well as literature from the um, sex offender, um, rehabilitation
program, um, within the confines of the Texas Department of Criminal Justice,
um, and um, also studies by, um, in terms of one author, Dr. Judy Johnson, um,
is one author who=s written, um, some works with
regards to sex offenders and there being no cure, um, for sex offenders. 

[Defense Counsel]: Judge,
objection to that. 

[The Court]:           Sustained.
Approach, please. 

(Off the record
discussion)

[The Court]:           Ladies and
gentlemen, you=re instructed to disregard the last
response of this witness. 








[The State]:            All right.
Dr. Thompson, without going into the conclusions made in these studies, okay, I
want to continue with the studies that you=re familiar with, the training that you had related to the
offenders. The last one you left off with was C tell me what that was called again. 

[Witness]:              Dr.
Johnson.

[The State]:            Okay. 

[Witness]:              And I
referenced the Sex Offender Rehabilitation Program, Association for the
Treatment of Sexual Abusers. 

[The State]:            What=s that association? What=s their focus? 

[Witness]:              Their focus
is treatment of sex offenders. And as such, they come up with guidelines to
help guide the practice of those who work with people who are adjudicated sex
offenders. 

[The State]:            And that C what=s the population that C the number of people for those studies that are
used to establish those guidelines and to make those determinations? 

[Witness]:              Literally,
thousands of sex of [sic] offenders who have been worked with. 

. . .

[The State]:            And you
said C the other organization that you
mentioned before this last one was theC

[Witness]:              Sex
Offender Rehabilitation Program. 

[The State]:            Yes, sir.
What do they deal with? 

[Witness]:              Well, this
is a program that=s available in the Texas Department
of Criminal Justice. 

[The State]:            Let me
rephrase my question. Are you familiar with studies that address whether these
types of behaviors are learned or not? Grooming, for example? 

[Witness]:              Yes. 

[The State]             Okay. And
what are some of those studies?

. . .








[Witness]               Well, the
same literature I=m referring to addresses that, as
well as the literature on victims of child sexual abuse certainly, um,
references that to, [sic] um, the, um, one very important, um, um, literature
review pertaining to everything regarding child sexual abuse, um, was done by
Lucy Berliner (phonetic), And that references C 

[The State]:            How many?

[Witness]:              It
references many, many articles pertinent to just the topics you=re speaking of. 

. . .

[The State]:            Okay. What=s the rough population that that
addresses?  How many thousands or millions of sex offenders are we talking
about?

[Witness]:              Well, I don=t know that I could say millions;
but certainly with the literature review referencing, I know it references over
fifty studies, um, you know, that C there are hundreds of offenders that are part of what=s went into that.  And it=s not just the offenders that are
being focused on in those studies.  It=s child sexual abuse, more generally offenders, but also
victim-related stuff.

[The State]:            Sure. And
without going into the findings of those studies, tell the jury the areas that
that specific study your=re talking about, that review of
those studies, what did it C in terms of offenders, what was its focus?

. . .

[Witness]:              Okay. Um,
the particular literature that I=m referring to, um, that one, um, in terms of offenders,
um, it certainly goes into, um, grooming, um, different ways that offenders
will lure, um, children, um, to abuse them, um, it, um, goes into some
treatment, um, issues.

[The State]:            And that=s C without telling the jury the findings, I want you
to be specific about the areas of treatment that it addresses, as well as
whether or not it addresses curabilities of these offenders.

[Witness]:              That
particular literature C

. . .

[The State]:            Is there
specific literature that addresses, just yes or no, specific literature that
addresses whether or not sex offenders can be cured? Just yes or no? 

[Witness]:              Yes.








[The State]:            Are you
familiar with that body of literature? 

[Witness]:              Yes.

[The State]:            Have you
been studying that body of literature since you were a graduate student? 

[Witness]:              Yes.

[The State]:            Have you C have you applied the theories in
that literature to your own practice? 

[Witness]:              Yes.

[The State]:            Do you have
an opinion as to whether sex offenders can be cured? 

[Witness]:              Yes.

[Defense Counsel]:          Objection,
judge.

[The Court]:           He may state
that he has an opinion.

[The State]:            What=s that opinion? 

[Defense Counsel]:          Objection.

[The Court]:           Sustained.

[The State]:            Do you have
an opinion as to whether or not C just yes or no C whether or not these behaviors of these sex offenders,
whether or not this is something that a person chooses to do? 

[Witness]:              Yes.

[The State]:            Okay. And
what is that opinion? 

[Defense Counsel]: Objection,
Judge. 

[The Court]:           Sustained. 

On cross-examination, appellant=s trial counsel
asked whether judges are fools for putting people on probation that have any
kind of sex offense, and Dr. Thompson answered that he would never characterize
a judge as a fool.  

On redirect examination, Dr. Thompson testified as follows:

[The State]:            [Defense
counsel] asked you about sex offenders on probation. Do you have an opinion
regarding whether offenders are good candidates for probation? 

[Witness]:              I do. 








[The State]:            And what is
that opinion? 

[Defense Counsel]:          Judge,
objection. 

[The Court]:           Sustained. 

[The State]:            Judge, he
ignored it [sic] by asking my witness about probation. 

[The Court]:           He=s not going to give his opinion.

[The State]:            Can a sex
offender be cured if he=s left on the streets? 

[Defense Counsel]: Objection,
Judge. He knows that=s improper.

[The Court]:           Sustained.
Is there anything else? 

[The State]:            In your
experience, have you known sex offenders that change while being on probation? 

[Defense Counsel]: Objection,
Judge. It=s backhanded opinion testimony in a
different form.

[The Court]:           Not this
one. Your objection is overruled on this one. 

[Witness]:              Would you
repeat the question, please? 

[The State]:            Do you have
an opinion as to whether or not sex offenders C  I=m sorry C in your experience, based on your
experience, have you seen sex offenders change if they=re left on the street? 

[Witness]:              Could C

[The State]:            Change for
the better if left on the street? 

[Witness]:              In my
clinical experience, I have not seen sex offenders who were just left on the
street, as you put it, get better. 








The trial court instructed the jury to disregard Dr.
Thompson=s volunteered
answer that Dr. Judy Johnson believes there is no cure for sex offenders, and
we presume that the jury followed this instruction.  See Wesbrook v. State,
29 S.W.3d 103, 116 (Tex. Crim. App. 2000).  In any event, this answer did not
state any opinion of Dr. Thompson.  A review of Dr. Thompson=s testimony shows
that he never stated any opinion during his punishment-phase testimony.  The
trial court sustained several of appellant=s objections to
questions soliciting Dr. Thompson=s opinions on
various matters.  When the State again asked for an opinion from Dr. Thompson
on redirect, and apparently argued that appellant had opened the door to such
testimony by his cross-examination, the trial court again sustained appellant=s objection,
stating that AHe=s not going to give his opinion.@  Because the
trial court would not let Dr. Thompson offer any expert opinion testimony, it
is not apparent that Rule 705(b) even applies, because it states that, upon
request, appellant shall be permitted to conduct a voir dire examination Adirected to the
underlying facts or data upon which the opinion is based.@ Tex. R. Evid.  705 (b) (emphasis
added); see Vasquez v. State, 819 S.W.2d 932, 935 (Tex. App.CCorpus Christi
1991, pet. ref=d) (holding that Rule 705(b) was not implicated
because expert witness gave only general opinions about sex offenders and the
manifestations of sexual abuse and did not give opinions based on an analysis
of the specific facts at issue testify about the specific facts of the case). 
But even if Rule 705(b) did require the trial court to allow appellant to voir
dire Dr. Thompson regarding the facts or data underlying his opinions, Dr.
Thompson did not  testify as to any opinions regarding appellant, and he never
even referred to appellant specifically.  Dr. Thompson provided very little
testimony that was damaging to appellant at the punishment phase, and the State
did not refer to Dr. Thompson=s testimony in its closing.[3]


After examining the record as a whole, this court has fair
assurance that the failure to allow a Rule 705(b) voir dire examination did not
influence the jury, or had but slight effect on the jury=s punishment
verdict.  Under a nonconstitutional harm analysis, we conclude that any error
in not allowing a Rule 705(b) voir dire examination was harmless.  See Tex. R. App. P. 44.2(b);  Harris v.
State, 133 S.W.3d 760, 774B75 (Tex. App.CTexarkana 2004,
pet. ref=d) (concluding
that trial court=s error in not allowing Rule 705(b) voir
dire examination was harmless because expert did not provide damaging
testimony).  Accordingly, we overrule appellant=s second issue.








C.      Did the trial court err in
allowing the State=s expert to testify because,
according to appellant, the proffered expert witness was not qualified to
testify as an expert and because his Abackdoor opinion@ violated Texas Rule of Evidence
702?

In his third issue, appellant contends the trial court
erred in admitting Dr. Thompson=s testimony because he was not qualified
to testify as an expert and because his Abackdoor opinion@ opinion that sex
offenders are not capable of being cured violated Rule 702.  First of all, as
noted above, Dr. Thompson never testified that in his opinion sex offenders are
not capable of being cured.  Appellant concedes as much but argues that Dr.
Thompson left the jurors with Athe unmistakable impression that
sex offenders were incapable of being cured.@[4]  Presuming,
without deciding, that although no witness testifies to an opinion, a party may
validly complain that a line of questioning has left the jury with an
unmistakable impression of an opinion that is allegedly inadmissible under Rule
702, appellant did not voice this complaint during the punishment phase. 
Likewise, appellant did not voice any complaint that Dr. Thompson lacked
qualifications to testify as an expert.  To preserve error based on the
erroneous admission of evidence, the objecting party must state the specific
ground for the objection unless that ground is apparent from the context. Tex. R. Evid. 103(a); Tex. R. App. P. 33.1.  Because neither
of these complaints was apparent from the context, appellant failed to preserve
error regarding these objections.  See Nino v. State, 223 S.W.3d
749, 755 (Tex. App.CHouston[14th Dist.] 2007, no pet.)
(holding appellant failed to preserve error as to evidentiary objection during
punishment phase); Moore v. State, 109 S.W.3d 537, 542 (Tex. App.CTyler 2001, pet.
ref=d) (concluding
that appellant=s objection under Rule 702 and Kelly was too
general to inform the trial court of the nature of his true complaint as such
rules cover numerous requirements for the admission of expert testimony). 
Accordingly, we overrule appellant=s third issue. 








D.      Did the trial court err in
allowing the prosecutor to allegedly engage in prosecutorial misconduct? 

In his fourth issue, appellant contends that the prosecutor=s repeated
attempts to inject testimony that sex offenders cannot be cured during Dr.
Thompson=s testimony
constitutes prosecutorial misconduct. The proper method of preserving error in
cases of prosecutorial misconduct is to (1) make a timely and specific
objection, (2) request an instruction that the jury disregard the matter
inappropriately placed before the jury, and (3) move for a mistrial. See
Penry v. State, 903 S.W.2d 715, 764 (Tex. Crim. App. 1995)
(holding that to preserve an objection for prosecutorial misconduct one must
not only object but also request an instruction to disregard and move for a
mistrial); see also Bailey v. State, No. 14-04-00325-CR, 2006 WL 348132,
at *5 (Tex. App.CHouston[14th Dist.] Feb. 6, 2006, no pet.) (same).  Regarding specificity, a party should Alet the trial
judge know what he wants, why he thinks himself entitled to it, and to do so
clearly enough for the judge to understand him at a time when the court is in a
proper position to do something about it.@ Lankston v.
State, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992).   An objection stating
one legal basis at trial may not be used to support a different legal theory on
appeal.  Bell v. State, 938 S.W.2d 35, 54 (Tex. Crim. App. 1996).

Appellant did not object in the trial court on the ground
of prosecutorial misconduct, nor did he receive an adverse ruling on such an
objection.  Appellant did not seek an instruction that the jury disregard any
impression or inference that sex offenders cannot be cured, nor did appellant
seek a mistrial based on any alleged prosecutorial misconduct. Thus, appellant
failed to preserve any error for appeal.  See Tex. R. App. P. 33.1; Penry, 903 S.W.2d at 764; see
also Bailey, 2006 WL 348132, at *5.  Accordingly, we overrule appellant=s fourth issue.  

 

 








Having overruled all of appellant=s issues, we
affirm the trial court=s judgment. 

 

 

 

/s/      Kem Thompson Frost

Justice

 

Judgment
rendered and Opinion filed October 30, 2007.

Panel
consists of Justices Anderson, Fowler, and Frost.

Do Not
Publish C Tex. R. App. P. 47.2(b).

 

 









[1]  This court previously denied appellant=s motion to abate for such a hearing. 





[2]  Appellant contends that because the witnesses were
in the courtroom ready to testify, we can presume that they would have given
favorable testimony on his behalf.  Regardless of this fact, there is no
evidence in his motion and supporting affidavit which demonstrates that
appellant would have benefitted from their testimony. 





[3]  Dr. Thompson did state that, in his clinical
experience, he has not seen sex offenders who are Aleft on the street@
get better.  However, because appellant and his trial counsel made a strategic
decision not to present any evidence, appellant was not eligible for community
supervision.  See Speth v. State, 6 S.W.2d  530, 533 (Tex. Crim. App.
1999) (stating that, to be eligible for jury-recommended community supervision,
a defendant bears the burden of proving that he has no prior felony
convictions).





[4]  Appellant refers to this Aunmistakable impression@ as AThompson=s >backdoor=
opinion.@